**FRIER LEVITT**
ATTORNEYS AT LAW
Alex J. Keoskey, Esq.
Todd Brower, Esq.
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
Sonali Setia (*pro hac vice to be filed*)
Catherine Weiss (*pro hac vice to be filed*)
Martin S. Hyman (*pro hac vice to be filed*)
Alexander Leonard (*pro hac vice to be filed*)
711 Third Avenue
New York, NY 10017
(212) 907-7300

*Attorneys for Plaintiff Aarti Patel, M.D.*

| | |
|---|---|
| AARTI PATEL, M.D.,<br><br>Plaintiff,<br><br>- vs. -<br><br>OPTUM MEDICAL CARE OF NEW JERSEY, P.C., and MAHESH TEKRIWAL, M.D.,<br><br>Defendants. | **Civil Action No.** |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**COMPLAINT**

Plaintiff Dr. Aarti Patel ("Dr. Patel" or "Plaintiff"), by and through her undersigned counsel, brings this action against Defendants Optum Medical Care of New Jersey, P.C. ("Optum") and Dr. Mahesh Tekriwal ("Dr. Tekriwal") (collectively, "Defendants"), and respectfully sets forth the following:

**INTRODUCTION**

1. This is an action to remedy Defendants' discriminatory and retaliatory conduct against Dr. Patel in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*,[1] New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 *et seq.*, New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 *et seq.*, and New Jersey common law.

2. Dr. Patel is a highly credentialed physician who proudly assumed the role as the first female Cardiologist at Optum in August 2023, and became an advocate for best practices medical care for her patients. During her employment with Optum, Dr. Patel was subjected to disparate treatment based on her sex. After Dr. Patel followed ethical and moral guidelines and reported substandard care practices by Dr. Tekriwal and complained about his discriminatory behavior and the hostile work environment he created, Defendants orchestrated a malicious and retaliatory campaign to drive her out of the practice and damage her reputation and career. This shameless attack on a dedicated female physician ultimately resulted in Dr. Patel's unlawful termination by Optum.

3. By this action, Plaintiff seeks back pay, front pay, lost benefits, compensatory damages, punitive damages, attorneys' fees and costs, liquidated damages, and other appropriate relief under Title VII, the LAD, the CEPA, and New Jersey common law.

**PARTIES**

4. Dr. Patel is a female resident of Manahawkin, New Jersey. Optum employed Dr. Patel as a physician in its Cardiology Department from August 2023 until her abrupt and unlawful termination effective February 12, 2024.

---

[1] Dr. Patel previously filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging violations of Title VII. She received a Notice of Right to Sue Letter on April 23, 2024.

5. Defendant Optum is a medical group practice located at 1364 Route 72 West, 2nd Floor, Manahawkin, NJ. It operates under Optum, Inc., a company headquartered in Eden Prairie, Minnesota. Optum is an "employer" under Title VII, the CEPA, and the LAD.

6. Defendant Dr. Tekriwal is an individual with a business address of 1364 Route 72 West, 2nd Floor, Manahawkin, NJ. During the relevant period, Optum employed Dr. Tekriwal as a physician in its Cardiology Department. As manager of Optum's Manahawkin Cardiology Department, Dr. Tekriwal was Dr. Patel's principal supervisor and had significant influence over hiring and firing, and set the terms and conditions of Dr. Patel's employment generally. Dr. Tekriwal is an "employer" under the CEPA and the LAD.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) over Plaintiff's federal claims. The Court has supplemental jurisdiction over Plaintiff's New Jersey state law claims pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims herein occurred in this District.

## FACTUAL BACKGROUND

### I. Optum Hires Dr. Patel, a Highly Experienced and Credentialed Physician, but Forces Her to Serve as a Merely Token Female Cardiologist.

9. Dr. Patel has been a cardiologist for over a decade. After graduating from New York University in 2001 on a full scholarship, Dr. Patel graduated from Rutgers Medical School in 2005 and completed her residency at Montefiore Medical Center in 2008. Dr. Patel then completed a three-year cardiology fellowship at the University Hospital and a one-year electrophysiology fellowship at New York Methodist Hospital.

10. Dr. Patel gained invaluable experience at several cardiology practices over the years: she practiced at Coastal Cardiovascular Consultants, Hamilton Cardiology, and Garden State Heart Care. Dr. Patel learned from many experienced cardiologists about the best practices for cardiovascular procedures, including but not limited to pacemaker implantation and device monitoring.

11. In or around January 2023, Dr. Tekriwal heard about Dr. Patel's skills and recruited her to join the cardiology department at Optum. Dr. Patel met with Dr. Tekriwal several times, visited Optum's facility, and discussed her prospective role with the Optum recruiting department.

12. In or around March 2023, following a successful vetting of her credentials, Optum offered Dr. Patel a position as the first female cardiologist at Optum's Manahawkin location. According to Dr. Tekriwal and other Optum employees with whom she met, Dr. Patel would primarily be responsible for general cardiology and electrophysiology consultations, in-office and remote cardiovascular device checks, and pacemaker and defibrillator procedures as needed. Dr. Patel viewed the offer as an incredible opportunity: not only would Dr. Patel be responsible for improving practices for the benefit of patients, but her employment by Optum would promote diversity at a male-dominated office in a male-dominated profession and industry.

13. Accordingly, in or around March 2023, Dr. Patel signed an employment contract with Optum (the "Employment Agreement").

14. Pursuant to the terms of the Employment Agreement, either party may terminate the Employment Agreement without cause upon ninety (90) days' prior written notice. In the event Optum terminates the Employment Agreement for cause, no prior written notice is required.

15. Dr. Patel and her husband sold their house in Middlesex County and purchased a house in Manahawkin, New Jersey in anticipation of a long and rewarding association with Optum.

16. On or about August 7, 2023, Dr. Patel started her new job as the first female cardiologist at Optum's Manahawkin location. At all times relevant hereto, Dr. Patel was qualified for and performed well in the position.

17. While Dr. Patel was excited and optimistic about the opportunity to care for patients and pave the way for more female cardiologists at Optum, she quickly learned that Dr. Tekriwal apparently had hired her as a token female, anticipating that, unlike the male cardiologists at Optum, she would remain unassertive and passive, and accede to his demands regarding patient care and practice protocols, demands which Dr. Tekriwal did not assert with regard to male colleagues at Optum. As discussed below, when Dr. Patel began expressing her concerns about Dr. Tekriwal's behavior, as well as certain of his and Optum's practices, Dr. Tekriwal became hostile, dismissive, and vindictive, setting into motion a chain of events that culminated in Dr. Patel's suspension and wrongful termination.

## II. Dr. Patel Calls Out Substandard Care Conditions at Optum, and by Dr. Tekriwal, and Immediately Faces Discriminatory Backlash from Dr. Tekriwal.

18. After Dr. Patel began her work, she soon observed that many of the cardiology department's systems and procedures were outdated, in disarray, or otherwise inconsistent with basic standards of patient care. Dr. Patel felt compelled, ethically as a physician and morally as a compassionate person, to respectfully speak up about the issues she witnessed and identified. These were issues for which Dr. Patel held an objectionably reasonable belief that Optum was in violation of applicable law, regulation, and public policy relating to health care compliance and risk management.

19. For example, Dr. Patel observed that Optum's "remote interrogation" system was not kept up to date and could be harmful to patients. Physicians conduct "remote interrogations" by virtually monitoring a patient's device, such as a pacemaker, on a website rather than during an

in-person check-up. When Dr. Patel first reviewed the "remote interrogation" system at Optum, she noticed that several doctors, including Dr. Tekriwal, did not regularly contact patients when their devices disconnected or update the system to indicate when a patient's device was no longer active or functioning properly, creating a real risk of an adverse outcome.

20. Dr. Patel was immediately troubled by the possibility of a cardiologist failing to detect an issue with a patient, such as an irregular heartbeat or device failure, due to a disconnected or malfunctioning device and raised such concerns to Dr. Tekriwal. Rather than listen to Dr. Patel, Dr. Tekriwal became irate, admonished her for questioning a "system" that he and his partner had been using for several decades, and summarily dismissed her.

21. Dr. Patel observed that when male cardiologists made suggestions to Dr. Tekriwal, they were never confronted with animosity or disdain and were often immediately lauded for expressing their opinions. Dr. Patel was disheartened to learn that Dr. Tekriwal's ego and habitual refusal to consider feedback from a female colleague was more important to him than patient safety concerns.

22. Dr. Tekriwal's dismissive, condescending and unprofessional treatment of Dr. Patel became a pattern. Whenever Dr. Patel tried to share her views on ways to improve patient care at Optum's cardiology department, Dr. Tekriwal made it abundantly clear that he did not want to hear her views. He looked down on her and often berated her for expressing opinions that did not conform to his way of doing things. Dr. Patel continued to observe that Dr. Tekriwal did not demean or berate any of the male cardiologists who shared their opinions with him, but he consistently did this with female employees at Optum.

23. Dr. Patel was undaunted and did not permit Dr. Tekriwal's abusive and discriminatory behavior to deter her from continuing to advocate for improving patient care. For

example, Dr. Patel expressed concern about the manner in which Dr. Tekriwal instructed physicians to conduct in-office device visits.

24. In-office device visits are appointments at Optum's office during which physicians check in with patients who have an implanted heart device, such as a pacemaker. In-office device visits permit the physician to monitor the device, obtain information about the device's functionality, and manage the patient's heart condition. Such visits are a critical component of care for extremely vulnerable patients.

25. As a cardiologist, Dr. Patel's responsibilities included conducting in-office device visits.

26. When Dr. Patel was trained in Optum's procedures for in-office device visits, she was shocked to learn that Dr. Tekriwal had directed physicians to forego standard best, or even basic, practices for medical appointments, including checking vital signs, in violation of the established standard of care for such in-office device visits.

27. Dr. Tekriwal's instruction to forego basic medical care during in-office device visits directly contradicted Dr. Patel's ethics as a medical professional. Dr. Patel could not fathom examining a patient with critical cardiovascular medical health concerns without having an adequate understanding as to that patient's medical history and present medical state. Accordingly, Dr. Patel continued to check each patient's vital signs and update their medical history during every in-office device visit.

28. Within Dr. Patel's first month of performing in-office device visits, she expressly told Dr. Tekriwal that physicians should conduct preliminary vital sign checks and question medical history prior to examining the patient's remote devices, in compliance with the appropriate standard of care.

29. Rather than consider Dr. Patel's recommendation, Dr. Tekriwal immediately dismissed Dr. Patel, publicly berated her for questioning his authority, and refused to change his mandates.

30. Dr. Patel remained concerned with patient safety and proper medical protocols and refused to refrain from addressing these real issues, even when doing so caused her to incur Dr. Tekriwal's wrath. Dr. Patel's concerns reflected not merely her personal views on patient safety issues, but long-established protocol which was, and continues to be, the proper standard of care for such procedures for the medical community at large. Because Dr. Tekriwal reprimanded her for challenging his instructions, in an attempts to enhance patient safety, Dr. Patel raised her concerns again with Drs. Anita Mitra and Jaffar Raza, the co-Directors of Cardiology at Optum. Initially, Dr. Raza told Dr. Patel that she should not be afraid to discuss the issue with Dr. Tekriwal. Dr. Tekriwal clearly treated Dr. Raza, a male cardiologist, with respect and thoughtfully listened to his opinions, but Dr. Patel knew from experience that her attempts to raise the issue with Dr. Tekriwal would again be derided and dismissed.

31. Eventually, Drs. Mitra and Raza raised the issue with Dr. Tekriwal. Dr. Patel's complaints triggered a meeting between Office Administrator Bernadette Perrini and Drs. Patel, Tekriwal, Hong, Mitra, and Raza. At that meeting, Dr. Tekriwal attempted to embarrass Dr. Patel in front of her colleagues by questioning her views and competence, while emphasizing that the flawed procedures that he had established at Optum's practice facility had worked fine for decades and should not be altered or revised.

32. Drs. Mitra and Raza lauded Dr. Patel's concern for, and efforts to improve, patient care, but those efforts caused Dr. Tekriwal to grow increasingly hostile toward Dr. Patel and to target her for retaliation.

33. For example, Dr. Tekriwal falsely accused Dr. Patel of "stealing" his patients when, in fact, Dr. Patel cared for Dr. Tekriwal's patients only when she was asked to cover for him on call and, on occasion, to follow up with those patients, when medically necessary, in order to ensure proper follow-up and adequate continuity of care. Rather than engage with Dr. Patel directly about this contrived issue, Dr. Tekriwal emailed Dr. Patel and a group of colleagues, implying that Dr. Patel was intentionally poaching his patients.

34. In addition to unnecessarily and unfairly admonishing Dr. Patel in front of her colleagues on false premises, Dr. Tekriwal volunteered Dr. Patel for extra work without checking or confirming her availability, disregarding the days off to which she was entitled.

35. Dr. Tekriwal also regularly spoke to Dr. Patel in a condescending and aggressive tone that was starkly at variance with the tone he used when speaking with male cardiologists. One day very early on in Dr. Patel's employment, for example, when Dr. Patel was meeting with medical device representatives, Dr. Tekriwal interrupted the meeting and needlessly scolded her about not meeting his expectations. Dr. Tekriwal raised his voice to the point where the people around them, including the device representatives, grew visibly uncomfortable and an employee asked Dr. Tekriwal and Dr. Patel to continue their conversation in a private room thereby humiliating Dr. Patel publicly.

36. When Dr. Patel mentioned Dr. Tekriwal's tone and behavior to her female colleagues at Optum, they readily acknowledged that Dr. Tekriwal spoke down to them as well. At least three medical assistants, several nurses, and one secretary—all female—commented to Dr. Patel about Dr. Tekriwal's abusive behavior toward them. Those women, however, excused it as something they had become accustomed to, in spite of acknowledging that they too felt Dr. Tekriwal's behavior was clearly discriminatory toward female professionals.

37. Dr. Tekriwal continually exhibited flagrant sex discrimination and was dismissive and hostile not only toward Dr. Patel, but also toward other female employees within Optum, only because of their status as women. Dr. Tekriwal's sexist behavior was so pervasive that at least one female medical assistant refused to work with him. Dr. Tekriwal did not engage in this form of hostile and abusive behavior toward any male cardiologists or staff at Optum.

### III. The Increasingly Hostile Work Environment and Disparate Treatment Forces Dr. Patel to Formally Complain.

38. Despite the toxic work environment that Dr. Patel faced on a daily basis, she tried to "keep her head down," prioritize patient care, and continue to familiarize herself with Optum's procedures and protocols so she could follow and improve them, as needed. In or around the beginning of January 2024, however, Dr. Patel could no longer ignore Dr. Tekriwal's abusive behavior and incessant need to embarrass her in front of her peers.

39. For example, Dr. Tekriwal continuously implied—in front of Dr. Patel's peers—that Dr. Patel neglected patients when, in fact, the opposite was true.

40. At first, Dr. Patel tried to ignore Dr. Tekriwal's sexist conduct and focus on her work, but Dr. Tekriwal's constant reproachful behavior toward her only intensified and became so stark that even her colleagues began to take notice of the abuse.

41. Dr. Mitra ultimately encouraged Dr. Patel to report Dr. Tekriwal to Optum's Human Resources Department.

42. Dr. Mitra's suggestion, however, was accompanied by a warning about the likely repercussions and consequences for, and retaliation that would result from, such an action, due to Dr. Tekriwal's vindictive nature.

43. Dr. Mitra stated that, if such a complaint were made, "someone is getting fired." Dr. Patel nevertheless lodged her complaint despite the real and imminent prospect of swift retaliation, due to her concerns for patient safety.

44. At Dr. Mitra's suggestion, on or around January 4, 2024, Dr. Patel reported to the Human Resources Department the discriminatory behavior, retaliatory conduct, and hostile work environment that Dr. Tekriwal created and continually fostered.

**IV. Following Dr. Tekriwal's Lead and Direction, Optum Orchestrates a Retaliatory Assault on Dr. Patel and Her Medical Career, While Refusing to Take Her Discrimination Complaint Seriously.**

45. Dr. Patel's complaint to Human Resources resulted in near-immediate retaliation against her, just as Dr. Mitra had predicted.

46. First, Dr. Tekriwal opened a sham hospital investigation against her concerning alleged issues with her technical skills. In this regard, on or around January 10, 2024, Dr. Patel received a phone call from the hospital's medical staff office advising her that Dr. Tekriwal requested a performance improvement ("PI") meeting concerning a procedure Dr. Patel had just performed. Typically, PI meetings are held with multiple physicians at a time but, in this instance, the PI committee confirmed that Dr. Patel would be the sole subject of the meeting. Dr. Patel obviously did not understand why she was the subject of a PI meeting concerning a patient that she had clearly treated properly.

47. By way of background, in or around early January 2024, Dr. Patel treated the patient for an issue requiring the repositioning of the patient's pacemaker. Over the course of several days, Dr. Patel—under the proctoring of another physician—performed a dual chamber pacemaker implant, a procedure that was routine for Dr. Patel and in keeping with her skill, education, training, and experience. When, after the procedure, she realized that a nurse had failed to place

the patient's arm in a sling as required for a smooth recovery, Dr. Patel meticulously monitored the patient's condition, ordering several X-rays and a CAT scan to ensure that the patient's condition was stable. Eventually, Dr. Patel transferred the patient to the Jersey Shore Medical Center, where the patient had a smooth recovery.

48. On or around January 15, 2024, Dr. Patel attended the PI meeting. Despite being completely uninvolved in the procedure, Dr. Tekriwal opened the meeting and took the opportunity to gratuitously admonish Dr. Patel. Dr. Patel stated that she treated the patient properly and attempted to walk the PI committee through the timeline of patient care, including the critical fact that the patient's arm was not placed in a sling by the attending nurse following the procedure. Dr. Edmund Karam, a physician with the Shore Heart Group and good friend of Dr. Tekriwal, interrupted Dr. Patel and baselessly opined that Dr. Patel's treatment was a "technical failure" and that she would need additional training to implant pacemakers—a procedure that she has successfully administered for over a decade and at more than nine different hospitals.

49. While the PI investigation was unfolding, Dr. Patel had two phone calls with representatives of Optum's Human Resources Department to complain about the ongoing discrimination and retaliation. It was immediately apparent to Dr. Patel, however, that Optum was not taking her complaint seriously. During the first phone call with Chief Medical Officer Dr. Gaurang Brahmbhatt and Human Resources representative Tracey Peterson, they asked whether she had complained of discrimination and retaliation to retaliate against Optum for initiating a (yet-to-commence) PI investigation against her. This insinuation greatly disappointed Dr. Patel, as it made clear that Optum questioned the veracity of her complaint. Moreover, the question was absurd, given that Dr. Patel could not possibly have complained in retaliation for a PI hearing that

was scheduled *after* she submitted her discrimination and retaliation complaint, based upon a pattern of behavior on the part of Dr. Tekriwal that had been ongoing for many months.

50. In a follow-up call with Human Resources Representative Celeste Utley, Dr. Patel explained the basis of her discrimination and retaliation complaint, and Utley, in a moment of honesty and candor, told Dr. Patel that it sounded like she was experiencing a hostile work environment. However, to date, Dr. Patel is not aware of Utley, or any other Optum employee, taking any measures to remediate the discrimination she faced.

51. Upon information and belief, Optum failed to conduct any investigation into Dr. Patel's claims regarding the discrimination, harassment, and retaliation she suffered, mainly at the hands, and at the instigation, of Dr. Tekriwal, or take any necessary action to address it.

**V. Defendants' Retaliation Campaign Amplifies and Ultimately Culminates in Dr. Patel's Unlawful Termination.**

52. The discriminatory and retaliatory campaign against Dr. Patel soon took a more ominous turn.

53. On or around January 26, 2024, Dr. Patel saw several patients and received gratitude from her patients for the care she was providing them. No patient or collaborative physician indicated that Dr. Patel was, in any way, acting in an unprofessional or unusual manner.

54. Later that day, Dr. Patel received a call from Optum requesting that she meet with Dr. Brahmbhatt. Dr. Patel was not informed of the subject matter of the meeting.

55. On or around January 29, 2024, Dr. Patel met remotely with Dr. Brahmbhatt and Ms. Peterson, who stated that unidentified individuals alleged that Dr. Patel had alcohol on her breath at work on the morning of January 26, 2024 and was acting erratically, and that unidentified individuals had found two alcohol bottles in the shared trash repository outside the facility. Dr. Patel vehemently denied this incredibly serious accusation, which was patently and demonstrably

false. Dr. Patel then walked Dr. Brahmbhatt and Ms. Peterson through her day and answered all their questions. Dr. Brahmbhatt and Ms. Peterson did not present Dr. Patel with a written notice concerning the accusation or disclose to Dr. Patel the identity of the accusers, whether there was any other physical evidence supporting the accusation, whether the alleged alcohol bottles had been retrieved and retained, who attributed the bottles to Dr. Patel, or any other information concerning this scurrilous, trumped-up charge. Dr. Brahmbhatt and Ms. Peterson informed Dr. Patel that they were looking into the allegation and would inform her of any findings.

56. Realizing that it had no basis for the accusation, Optum did not place Dr. Patel on administrative leave at that time nor direct her to stop seeing her patients. Clearly, had Optum truly believed that the intoxication and "erratic behavior" accusations had any merit it would not (and should not) have knowingly allowed Dr. Patel to continue seeing patients, in keeping with the customary procedure when addressing impaired physicians.

57. In reality, Optum's managers knew that the allegations were baseless, that Dr. Patel was not consuming alcohol while at work, and that the purported witnesses had no evidence of her supposed inebriation. Optum's managers knew that they needed to concoct a different story as a pretext to justify her termination and take other adverse action against her.

58. After the aforesaid meeting, Dr. Patel continued her day as she typically would. She went to the hospital, checked on two of her sick patients, and traveled back to Optum's office to prepare for upcoming appointments.

59. Later that day, Dr. Brahmbhatt and Ms. Peterson pivoted to a new narrative: they admonished Dr. Patel for seeing patients while their investigation was ongoing, despite not previously having told her that she was being placed on leave or directing her not to see patients.

They advised Dr. Patel, for the first time, that she was being placed on administrative leave pending the investigation.

60. Upon being told by Dr. Brahmbhatt and Ms. Peterson that she was placed on leave, Dr. Patel left the premises and did not see any patients.

61. After being placed on leave, Dr. Patel grew anxious and worried about the future of her career. During the next two weeks, no one at Optum provided any substantive updates on the progress of the so-called investigation, and no one at Optum reached out to Dr. Patel to discuss these fabricated accusations, despite having promised to update her and be in touch about next steps.

62. In the meantime, on or around February 7, 2024, Utley informed Dr. Patel that Optum investigated Dr. Patel's January 4, 2024 complaint concerning discrimination at Optum and took "appropriate action . . . where applicable." Utley did not inform Dr. Patel what steps, if any, were actually taken to address Dr. Tekriwal's discriminatory behavior against Dr. Patel and provided no indication that any investigation into Dr. Patel's complaint was actually conducted.

63. In light of Optum's lack of urgency with regard to the investigation of Dr. Patel's alleged conduct, in stark contrast to the swift dismissal of Dr. Patel's discrimination and retaliation complaint against Dr. Tekriwal, on or about February 8, 2024, Dr. Patel, through counsel, complained of discrimination and retaliation in a letter to Dr. Brahmbhatt and Ms. Peterson.

64. Optum promptly retaliated against Dr. Patel once again, this time permanently and catastrophically.

65. On or about February 12, 2024, *i.e.*, four days after receiving the letter from Dr. Patel's counsel outlining her protected complaints of discrimination and retaliation, Optum sent

Dr. Patel an unexplained invitation to meet with Dr. Brahmbhatt and Optum Vice President, Human Capital Partner Debra Bierman.

66. Given the fact that her very livelihood was at stake, Dr. Patel requested the presence of her counsel at this meeting as she was understandably nervous, given Optum's lack of transparency and the very recent protected activity and letter by her counsel that seemingly prompted this unexplained meeting. Optum flatly rejected this reasonable request without explanation.

67. During the meeting, Dr. Brahmbhatt notified Dr. Patel that she had been terminated for breaching Optum's "code of conduct." Dr. Brahmbhatt did not specify the provision of the code of conduct that Dr. Patel supposedly breached or provide any evidence supporting the purported breach. Dr. Brahmbhatt stated that the decision was made due to her "behaviors during the course of the investigation," but refused to provide any details regarding the investigation to even suggest what Dr. Patel had done in violation of the code of conduct. Ms. Bierman baldly and coldly stated that "the termination notice will explain everything." But the termination notice explained nothing.

68. When Dr. Patel asked for clarification regarding the alleged investigation, Dr. Brahmbhatt repeated himself and claimed that Dr. Patel "declined to follow" instructions given to her during the investigation. Dr. Brahmbhatt did not specify what instructions Dr. Patel declined to follow and, in response to Dr. Patel asking about the instructions, Dr. Brahmbhatt said that "any more detail should be discussed with [her] counsel."

69. This justification for Dr. Patel's termination was pretextual and the Optum "investigation" was a sham. Optum did not specify the manner in which Dr. Patel violated the code of conduct because it could not meaningfully (or truthfully) do so. Specifically, after being

placed on leave and receiving the directive that she could no longer see patients, Dr. Patel left the premises and did not see or treat any patients. She stayed at home and communicated with Optum only to check on the status of the investigation and, through her counsel, complained of discrimination and retaliation. To be clear, she did not fail to follow any "instruction" from Optum.

70. Contrary to Ms. Bierman's statement and Dr. Brahmbhatt's insinuations made during the termination meeting, Dr. Patel's two-sentence termination notice dated February 12, 2024 (the "Termination Notice") provided no further explanation of her termination.

71. The Termination Notice simply stated that the termination is pursuant to "Article 10[(b)](xii) of the [Employment] Agreement."

72. Optum could not provide a credible reason for Dr. Patel's termination (or its sham investigation) because it did not have one. When Optum's managers realized that their accusation that Dr. Patel had consumed alcohol while working was entirely false, they searched for any reason they could come up with to justify her termination. But the best they conjure up was the groundless assertion that Dr. Patel violated some unspecified code of conduct provision by declining to follow unspecified instructions. Despite Optum's baseless and shameless attempt to manufacture a false narrative against Dr. Patel, her termination was plainly without cause and in violation of federal and state law.

73. Dr. Patel's termination resulted in an immediate cessation of pay and, upon information and belief, the cancellation of her medical malpractice insurance.

74. To date, Dr. Patel is unaware of, and has not been presented with any evidence supporting, any findings of misconduct against her.

75. As a result of Defendants' incessant discriminatory, malicious, and retaliatory behavior toward her, Dr. Patel has suffered monetary and other economic damage, extensive

mental anguish, emotional distress, and related medical issues. Among other things, Dr. Patel's reputation has been severely tarnished in South Jersey such that, upon information and belief, Dr. Patel has virtually no chance of finding work in that geographic location for the remainder of her career. As a result, Dr. Patel was forced to look for employment far from her home and connections and sell her new house in Manahawkin at a loss.

**COUNT ONE**
**(Sex Discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2)**
**(Against Defendant Optum)**

76. Dr. Patel repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein.

77. At all relevant times, Dr. Patel was a female employee of Optum and was within a class protected by Title VII.

78. At all relevant times, Optum was an employer under Title VII.

79. At all relevant times, Dr. Patel was qualified for her position with Optum.

80. Optum knowingly violated Title VII, with malice and reckless indifference towards Dr. Patel, by unlawfully discriminating against her on the basis of her sex by providing harsh criticism, demeaning her capabilities and professionalism in front of colleagues and patients, and reprimanding her for nonsensical and pretextual reasons.

81. Male employees who were similarly situated to Dr. Patel were treated more favorably, while female employees like Dr. Patel were belittled, humiliated, and marginalized based solely upon their sex.

82. As a direct and proximate result of these actions, Dr. Patel has suffered and continues to suffer damages to her career, adverse job consequences, including economic damages, and continues to suffer damages, including severe mental and emotional stress, pain and suffering,

anxiety, stress, humiliation, and damages to reputation and career in an amount to be determined at trial.

**COUNT TWO**
**(Hostile Work Environment under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2)**
**(Against Defendant Optum)**

83. Dr. Patel repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein.

84. At all relevant times, Dr. Patel was a female employee of Optum and was within a class protected by Title VII.

85. At all relevant times, Optum was an employer under Title VII.

86. At all relevant times, Dr. Patel was qualified for her position with Optum.

87. Optum knew about the unlawful discrimination and harassment of Dr. Patel by Dr. Tekriwal and others, failed to take remedial action, and prevented Dr. Patel from taking remedial action. Optum further unlawfully discriminated against Dr. Patel in the terms and conditions of her employment on the basis of her sex in violation of Title VII by creating, fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or remedy a hostile and abusive work environment that included, among other things, severe and pervasive discrimination against and harassment of Dr. Patel, which would not have occurred but for her status as a female.

88. As a direct and proximate result of these actions, Dr. Patel has suffered and continues to suffer damages to her career, adverse job consequences, including economic damages, and continues to suffer damages, including severe mental and emotional stress, pain and suffering, anxiety, stress, humiliation, and damages to reputation and career in an amount to be determined at trial.

**COUNT THREE**
**(Retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3)**
**(Against Defendant Optum)**

89. Dr. Patel repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein.

90. At all relevant times, Dr. Patel was a female employee of Optum and was within a class protected by Title VII.

91. At all relevant times, Optum was an employer under Title VII.

92. Optum retaliated against Dr. Patel for having exercised her right to oppose and seek redress for unlawful discrimination and a hostile work environment.

93. On or about January 4, 2024, Dr. Patel submitted a complaint to the Employee Relations Department at Optum complaining of discrimination.

94. Subsequently, on or about February 8, 2024, Dr. Patel's counsel submitted a letter to Optum's counsel to complain of clear and pervasive discrimination and retaliation.

95. To punish Dr. Patel for complaining about violations of anti-discrimination laws, Optum engaged in a campaign of retaliation, including, among other things, causing the PI committee to open an investigation concerning a routine procedure that Dr. Patel conducted on a patient, open an investigation concerning the absurd accusation that Dr. Patel drank alcohol at Optum, place Dr. Patel on administrative leave, and, ultimately, unlawfully terminate Dr. Patel's employment.

96. As a direct and proximate result of these actions, Dr. Patel has suffered and continues to suffer damages to her career, adverse job consequences, including economic damages, and continues to suffer damages, including severe mental and emotional stress, pain and suffering,

anxiety, stress, humiliation, and damages to reputation and career in an amount to be determined at trial.

**COUNT FOUR**
**(Sex Discrimination under New Jersey Law Against Discrimination, N.J.S.A. 10:5-12)**
**(Against All Defendants)**

97. Dr. Patel repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein.

98. At all relevant times, Dr. Patel was a female employee of Optum and was within a class protected by LAD.

99. At all relevant times, Optum was an employer under the LAD.

100. At all relevant times, Dr. Patel was qualified for her position with Optum.

101. Optum knowingly violated the LAD, with malice and reckless indifference towards Dr. Patel, by unlawfully discriminating against her on the basis of her sex by providing harsh criticism, demeaning her capabilities and professionalism in front of colleagues and patients, and reprimanding her for nonsensical and pretextual reasons, none of which would have occurred but for her status as a female.

102. Male employees who were similarly situated to Dr. Patel were treated more favorably, while female employees were belittled, humiliated, and marginalized based solely upon their sex.

103. Dr. Tekriwal aided and abetted Optum's sex discrimination against Dr. Patel by, among other things, berating her and dismissing her when she confronted Dr. Tekriwal when he did not do so upon confrontation by male cardiologists.

104. As a direct and proximate result of these actions, Dr. Patel has suffered and continues to suffer damages to her career, adverse job consequences, including economic damages,

and continues to suffer damages, including severe mental and emotional stress, pain and suffering, anxiety, stress, humiliation, and damages to reputation and career in an amount to be determined at trial.

**COUNT FIVE**
**(Hostile Work Environment under New Jersey Law Against Discrimination, N.J.S.A. 10:5-12)**
**(Against All Defendants)**

105. Dr. Patel repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein.

106. At all relevant times, Dr. Patel was a female employee of Optum and was within a class protected by LAD.

107. At all relevant times, Optum was an employer under the LAD.

108. At all relevant times, Dr. Patel was qualified for her position with Optum.

109. Optum knew about the unlawful discrimination and harassment of Dr. Patel by Dr. Tekriwal and others, failed to take remedial action, and prevented Dr. Patel from taking remedial action. Optum further unlawfully discriminated against Dr. Patel in the terms and conditions of her employment on the basis of her sex in violation of the LAD by creating, fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or remedy a hostile work environment that included, among other things, severe and pervasive discrimination against and harassment of Dr. Patel, based solely on her status as a female.

110. Dr. Tekriwal aided and abetted Optum in creating, fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or remedy a hostile work environment that included, among other things, severe and pervasive discrimination against and harassment of Dr. Patel.

111. As a direct and proximate result of these actions, Dr. Patel has suffered and continues to suffer damages to her career, adverse job consequences, including economic damages,

and continues to suffer damages, including severe mental and emotional stress, pain and suffering, anxiety, stress, humiliation, and damages to reputation and career in an amount to be determined at trial.

**COUNT SIX**
**(Retaliation in Violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12)**
**(Against All Defendants)**

112. Dr. Patel repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein.

113. At all relevant times, Dr. Patel was a female employee of Optum and was within a class protected by LAD.

114. At all relevant times, Optum was an employer under the LAD.

115. Optum retaliated against Dr. Patel for having exercised her right to oppose and seek redress for unlawful discrimination and a hostile work environment.

116. On or about January 4, 2024, Dr. Patel submitted a complaint to the Employee Relations Department at Optum complaining of discrimination.

117. Subsequently, on or about February 8, 2024, Dr. Patel's counsel submitted a letter to Optum's counsel to complain of discrimination and retaliation.

118. To punish Dr. Patel for complaining about violations of anti-discrimination laws, Optum engaged in a campaign of retaliation, including, among other things, causing the PI committee to create a pretext for the purpose of retaliating against Dr. Patel; specifically, to open an investigation concerning a routine procedure that Dr. Patel conducted on a patient, open an investigation concerning the absurdly unfounded accusation that Dr. Patel drank alcohol at Optum, place Dr. Patel on administrative leave, and, ultimately, terminate Dr. Patel's employment.

119. Dr. Tekriwal aided and abetted Optum's unlawful retaliation against Dr. Patel by, among other things, participating in the PI committee that opened a pretextual and dubious investigation concerning a routine procedure that Dr. Patel conducted on a patient.

120. As a direct and proximate result of these actions, Dr. Patel has suffered and continues to suffer damages to her career, adverse job consequences, including economic damages, and continues to suffer damages, including severe mental and emotional stress, pain and suffering, anxiety, stress, humiliation, and damages to reputation and career in an amount to be determined at trial.

**COUNT SEVEN**
**(Retaliation in Violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8)**
**(Against All Defendants)**

121. Dr. Patel repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein.

122. Optum and Dr. Tekriwal are Dr. Patel's employers under the CEPA.

123. Dr. Patel reasonably believed that Optum's and Dr. Tekriwal's practices of conducting remote interrogations and in-office device visits in that manner are incompatible with clear mandates of public health policy and safety relating to health care risk management and compliance.

124. Dr. Patel objected to Optum's and Dr. Tekriwal's practices of conducting remote interrogations and in-office device visits without checking patients' vital signs or medical history and notified Drs. Tekriwal, Mitra, and Raza of her objections.

125. To punish Dr. Patel for engaging in a protected activity under CEPA, Optum engaged in a campaign of retaliation, including, among other things, causing the PI committee to open a pretextual investigation concerning a routine procedure that Dr. Patel conducted on a

patient, opening an investigation concerning the absurdly unfounded accusation that Dr. Patel drank alcohol at Optum, placing Dr. Patel on administrative leave, and, ultimately, terminating Dr. Patel's employment.

126. To punish Dr. Patel for engaging in a protected activity under CEPA, Dr. Tekriwal engaged in a campaign of retaliation by, among other things, participating in the pretext of a PI committee that opened an investigation concerning a routine procedure that Dr. Patel conducted on a patient.

127. As a direct and proximate result of these actions, Dr. Patel has suffered and continues to suffer damages to her career, adverse job consequences, including economic damages, and continues to suffer damages, including severe mental and emotional stress, pain and suffering, anxiety, stress, humiliation, and damages to reputation and career in an amount to be determined at trial.

**COUNT EIGHT**
**(Intentional Infliction of Emotional Distress)**
**(Against All Defendants)**

128. Plaintiff repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein.

129. Defendants acted with an intent to cause Dr. Patel emotional distress and/or a reckless disregard for the high probability that emotional distress would occur by, among other things, falsely asserting that Dr. Patel, a conscientious, hard-working, and caring physician, had consumed alcohol while treating patients at Optum.

130. The conduct of Defendants was reckless, extreme, and outrageous in nature, intolerable in a civilized society, and intended by these Defendants to derail and sabotage Dr. Patel's career.

131. As a proximate result of the conduct of Defendants, Dr. Patel has suffered and continues to suffer severe mental stress, emotional injuries, and economic loss, including but not limited to developing stress-based gastritis.

132. Defendants committed these actions maliciously and oppressively, with the wrongful intention of causing harm to Dr. Patel, with the motive amounting to malice and in conscious disregard of Dr. Patel's rights.

133. As a direct and proximate result of these actions, Dr. Patel suffered and continues to suffer damages in an amount to be determined at trial.

**COUNT NINE**
**(Breach of Contract – Section 10 of the Employment Agreement)**
**(Against Defendant Optum)**

134. Plaintiff repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if set forth herein.

135. Dr. Patel and Optum entered into a valid and enforceable contract by executing the Employment Agreement.

136. The Employment Agreement constituted the entire agreement between Dr. Patel and Optum regarding the terms and conditions of Dr. Patel's employment.

137. Section 10(a) of the Employment Agreement provides that either Dr. Patel or Optum can terminate the Employment Agreement without cause upon 90 days' prior written notice.

138. Section 10(b) of the Employment Agreement permits Optum to terminate the Employment Agreement for cause without prior written notice.

139. Section 34 of the Employment Agreement provides that a prevailing party in any litigation involving the Employment Agreement is entitled to "all expenses incurred, including but not limited to, reasonable attorneys' fees and court costs from the non-prevailing party."

140. At all relevant times, Dr. Patel faithfully performed her obligations under the Employment Agreement.

141. Optum unilaterally, and without prior notice, terminated the Employment Agreement, claiming that the termination was for cause pursuant to Section 10(b)(xii) of the Employment Agreement.

142. Optum's purported "cause" for termination is false and pretextual, as Dr. Patel was in fact terminated for engaging in protected activity under the relevant statutes.

143. As Optum's decision to terminate the Employment Agreement was clearly without cause, it should have provided Dr. Patel with at least 90 days' written notice of the termination of employment and tail insurance pursuant to Section 10(a) of the Employment Agreement.

144. Optum's decision to terminate the Employment Agreement without cause violates Section 10(a) of the Employment Agreement.

145. As a direct and proximate result of Optum's contractual breach, Dr. Patel has suffered and continues to suffer economic damages in an amount to be determined at trial and is entitled to costs and reasonable attorneys' fees pursuant to Section 34 of the Employment Agreement.

WHEREFORE, plaintiff Dr. Aarti Patel demands judgment in her favor against Defendants, as follows:

(a) Declaring that the acts, practices, and omissions complained of herein violate Title VII, the New Jersey Law Against Discrimination, the Conscientious Employee Protection Act, and New Jersey common law;

(b) back pay and benefits

(c) front pay and benefits;

(d) reinstatement of tail insurance;

(e) compensatory damages;

(f) punitive damages;

(g) attorneys' fees, costs, and disbursements;

(h) pre- and post-judgment interest;

(i) costs of suit; and

(j) such other relief as the Court may deem equitable and just.

Dated: May 14, 2024

FRIER LEVITT, LLC

/s/ Alex Keoskey
By:____________________________
Alex J. Keoskey, Esq.
Todd Brower, Esq.
84 Bloomfield Avenue
Pine Brook, NJ 07058
akeoskey@frierlevitt.com
tbrower@frierlevitt.com
Tel: (973) 618-1660

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP

/s/ Sonali Setia
By:____________________________
Sonali Setia (*pro hac vice to be filed*)
Catherine Weiss (*pro hac vice to be filed)*
Martin S. Hyman (*pro hac vice to be filed*)
Alexander W. Leonard (*pro hac vice to be filed)*

711 Third Avenue, 17th Floor
New York, NY 10017
ssetia@golenbock.com
cweiss@golenbock.com
mhyman@golenbock.com
aleonard@golenbock.com
Tel: (212) 907-7300

*Attorneys for Plaintiff Aarti Patel, M.D.*

**JURY DEMAND**

Plaintiff Dr. Aarti Patel demands a trial by jury with respect to all issues properly triable by jury.

Dated: May 14, 2024

FRIER LEVITT, LLC

/s/ Alex Keoskey
By:____________________________
Alex J. Keoskey, Esq.
Todd Brower, Esq.
84 Bloomfield Avenue
Pine Brook, NJ 07058
akeoskey@frierlevitt.com
tbrower@frierlevitt.com
Tel: (973) 618-1660

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

/s/ Sonali Setia
By:____________________________
Sonali Setia (*pro hac vice to be filed*)
Catherine Weiss (*pro hac vice to be filed)*
Martin S. Hyman (*pro hac vice to be filed*)
Alexander W. Leonard (*pro hac vice to be filed)*

711 Third Avenue, 17th Floor
New York, NY 10017
ssetia@golenbock.com
cweiss@golenbock.com
mhyman@golenbock.com
aleonard@golenbock.com
Tel: (212) 907-7300

*Attorneys for Plaintiff Aarti Patel, M.D.*