# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CIVIL ACTION:
Civil Action No. 3:24-cv-6133

---

AARTI PATEL, M.D.,

Plaintiff,

-vs-

OPTUM MEDICAL CARE OF NEW JERSEY, P.C., and MAHESH TEKRIWAL, M.D.,

Defendants.

---

DEPOSITION UPON ORAL EXAMINATION OF BERNADETTE PERRINI

Wednesday, October 1st, 2025

T R A N S C R I P T of the deposition taken remotely via Zoom video conference of BERNADETTE PERRINI, called for oral examination in the above-entitled action, said deposition being taken pursuant to Rules governing Civil Practice in the Courts of New Jersey, by and before RENEE BETHEL, a Certified Court Reporter of the State of New Jersey, commencing at 1:30 p.m.

SCHULMAN, WIEGMANN & ASSOCIATES
Certified Court Reporters
216 Stelton Road, Suite C1
Piscataway, New Jersey 08854
(732) 752-7800 Ext. 205
Fax (732) 752-7166

B E R N A D E T T E P E R R I N I, appearing remotely and having first been duly sworn according to law, testified as follows:

DIRECT EXAMINATION BY MR. BURDEN:

Q Good afternoon, Ms. Perrini. My name is Jim Burden. I'm an attorney with the law firm of McClure Burden, and we represent Dr. Patel in the lawsuit that she's brought against Optum and Dr. Tekriwal.

We are here this afternoon to take your deposition. Have you ever been deposed before?

A Yes.

Q Okay. And how many times?

A Once.

Q And what was that in connection with, if you remember?

A It was a personal injury.

Q Okay. Were you the plaintiff, or were you being sued?

A I was the plaintiff.

Q Okay. Well, I'll give you some instructions for today's deposition. I'm going to ask that you make all of your responses verbal for

A Yes. I spoke to them individually and said, "I need you please just to, you know, give me a brief synopsis of what transpired."

Q Okay. And did you tell them not to talk to each other about these events while they were writing their witness statements?

A I did not.

Q Do you know whether they did confer with each other while they were writing their witness statements?

A I do not know that.

Q Let me just go -- so this last statement by Megan Scott, first of all, this is in the form of an e-mail. So you are sending an e-mail to yourself, and it says, "This is from Megan Scott, who was working with Dr. Patel today."

And it says, "I smelled liquor on her breath at around 11:00 before she went in with first or second patient."

How did Ms. Scott give you that statement? Is that what she said to you? Did she ever write that down?

A She put it in a text to me.

Q And if we look at Megan Scott's statement, she says that she smelled liquor on Dr.

Patel's breath before she went in with her first or second patient. Do you see that?
A Yes.
Q And if we flip back to Stephanie's witness statement, Stephanie says that the stress tests for Dr. Patel were at 9:00, 9:15, and 9:30; right?
A Correct.
Q So is Megan wrong when she says that Dr. Patel went in with her first or second patient at 11:00 in the morning?
A No. I think the issue is there is two separate things going on here. There is the stress testing happening downstairs, and there is patients upstairs. So by the time Dr. Patel, I guess, is finished with her last patient and was coming upstairs to see a patient upstairs, it was close to 11:00.
Q Okay. So Dr. Patel had a whole schedule of patients that day in addition to the stress tests?
A Yes.
Q Did you send Dr. Patel home that day?
A No.
Q Why did you not send her home after

the staff told you that they smelled alcohol on her breath?

MS. STAMPP: Objection as to form.

A That transpired later in the day.

Q So when did the staff come to you and tell you that they smelled alcohol on Dr. Patel's breath?

A I don't recall the exact time. Meliss Mirandi did come to me, and she made the first initial statement to me that she smelled alcohol.

Q So when Meliss came to you and told you that she smelled alcohol on Dr. Patel's breath, what did you do?

A I don't recall. I said -- I believe I just said, "Okay. Well, let's just watch. Let's keep on eye." I really don't recall the whole conversation.

Q Did you go -- after Meliss -- where did that conversation take place?

A In my office.

Q After that conversation, did you go talk to Dr. Patel to see whether you could smell alcohol on her breath?

A I did not.

Q In Optum's building on Route 72 there,

smelled alcohol; correct?
A Correct.
Q So was your next step to reach out to Anita to tell her about this?
A I didn't reach out to Anita until the bottles were found.
Q Okay. What time of day were the bottles found?
A Exact time, I'm not sure. Between 2:00, and 2:30, maybe 2:00 and 2:45. I'm not sure of the exact time.
Q So if the bottles were found at approximately 2:30 or 2:45 p.m., how long before that had Meliss come to you and told you that she smelled alcohol on Dr. Patel's breath?
A It was afternoon sometime. I just don't recall the exact time.
Q Who found the bottles?
A I did.
Q Okay. Where did you find the bottles?
A In the trash receptacle inside the employee bathroom.
Q And how many employees were working at your office at Optum that day?
A Just give me a minute to, kind of, add up in

my head because Friday is a very light day in the office. Maybe twenty.

Q And where is the employee bathroom located?

A There is two employee bathrooms. There is one right by -- down the hall from my area, which is around the corner from Dr. Tekriwal's area, and then the other one is on the total opposite side of the building.

Q And which location was it where you found the bottles?

A The one around the corner from Dr. Tekriwal's area and down the hall from me.

Q Can members of the public utilize that -- either one of those employee bathrooms?

A No.

Q Are they coded with some kind of lock?

A No. It says, "Staff only."

Q Do you know whether members of the public use the bathroom even if there is a sign that says, "Staff only"?

A I don't know.

Q Are those bathrooms locked at all?

A No. Only when you enter in, you push the lock to lock the door.

and let me -- you know, basically, "Tell me from start to finish what transpired and what you were implying."

Q So if I go to Meliss's statement, there is nothing in Meliss's statement that says she smelled alcohol on Dr. Patel's breath; correct?
A Correct.
Q The only one that says that they smelled alcohol on Dr. Patel's breath was Megan Scott; correct?
A Correct.
Q Okay.
(Exhibit P-10 is screen shared.)
Q So, Ms. Perrini, I'm showing you a copy of a document that was marked as P-10 for identification. This first page is an e-mail from you to Sulma Balmos, 1/26/24 at 3:08 p.m. in the afternoon, and the second page is a picture of two Fireball bottles.
Did you take that picture?
A I did.
Q When you got the bottles out of the trash, did you have surgical gloves on?
A Yes. I put gloves on.
Q How far down into the trash were the

bottles?
A They were at the bottom.
Q And what was on top of them?
A Paper towels.
Q What did you do with the bottles?
A I grabbed them with the gloves with paper towel, and I put them in my office in a cabinet. And when I left the building, I took them out of the cabinet in the paper towel, and I currently have them at my home in a bag.
Q Okay. What kind of bag are they in?
A A Ziploc bag.
Q Have you ever given those bottles to anyone else?
A No.
Q Have they ever been forensically tested for DNA or fingerprints?
A No.
Q Okay. Ms. Perrini, this is -- I want to review a document with you that I marked as P-42 for identification.
(Exhibit P-42 is screen shared.)
Q This is a series of text messages that have been produced to me by Dr. Tekriwal in the case, and I want to take some time and go through

A I believe it was before.

Q Okay. Have you ever had employees placed on administrative leave before Dr. Patel?

A No.

Q Do you remember how long this phone call was?

A Twenty minutes; fifteen, twenty minutes.

Q Okay.

A It wasn't a very lengthy call, but it wasn't a quick call.

Q Did you say anything during that call?

A I believe I mentioned about the jar.

And Dr. Patel was very -- she was -- she was very upset, very upset that day, and she -- Dr. Patel had said to me that this is all in -- this is Dr. Tekriwal being -- you know, getting -- retaliating against her.

Q What did you say to Dr. Patel when she said that this was retaliation?

A I don't know if I said anything. I don't recall.

Q Okay. So in this note by Nicolyn Neighbors describing the January 29th, 2024, conference call, is it you that's talking when you are relating that Dr. Patel came in and showed you

the bottle of pills and asked about whether they made her breath smell like alcohol? That's all information that's coming to you; correct -- or coming from you; correct?
A Yes.
Q Okay.
A And there was a coworker in my office with me when that occurred.
Q Right. That was the assistant manager, Bobbi Snider; correct?
A Correct.
Q And this is also you telling them that Dr. Patel said that this was retaliation; correct?
A Yes.
Q Okay. Other than coming back into the office to turn in her computer, did Dr. Patel ever return to the office after January 29, 2024?
MS. STAMPP: Objection as to form.
A She did to return her keys and laptop. I met her in the foyer downstairs.
Q Right. But my question was, other than that, other than that occasion where she came in to return her keys and her laptop, did she ever step foot in Optum's Manahawkin office again after January 29, 2024?

C E R T I F I C A T E

I, RENEE BETHEL, a Certified Court Reporter and Notary Public of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the deposition that was taken stenographically by me to the best of my ability of said witness who was first duly sworn by me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative, nor employee, nor attorney, nor counsel of any of the parties to the action for which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel in this action, nor am I financially interested in this case.

Renee Bethel, CCR

RENEE BETHEL, CCR
License No. 30X100228800