# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO.: 24-cv-06133

AARTI PATEL, M.D.,
Plaintiff, DEPOSITION OF:
vs. AARTI PATEL, M.D.
OPTUM MEDICAL CARE OF NEW JERSEY, P.C. and MAHESH TEKRIWAL, M.D.,
Defendants.

- - - - - - - - - - - - - - - -

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter as taken by and before RUTHANNE UNGERLEIDER, a Certified Court Reporter and Notary Public of the State of New Jersey, held at the office of McCLURE BURDEN, 25 Pompton Avenue, Verona, New Jersey, on Thursday, October 9, 2025, commencing at approximately 9:50 in the forenoon.

A P P E A R A N C E S:

McCLURE BURDEN
25 Pompton Avenue, Ste. 101
Verona, New Jersey 07044
BY: JAMES BURDEN, ESQ.
Attorneys for Plaintiff

SEYFARTH SHAW
620 Eighth Avenue, 32nd Floor
New York, New York 10018
BY: JOSEPH M. VENTO, ESQ.
Attorneys for Defendants

ALSO PRESENT:
MAHESH TEKRIWAL
CATHERINE WEISS, ESQ. Via Zoom



I N D E X


| AARTI PATEL | PAGE |
|---|---|
| By: Mr. Vento | 4 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Patel 1 | OPTUM 50 through 53 | 16 |
| Patel 2 | OPTUM 54 through 72 | 59 |
| Patel 3 | TEKRIWAL 5 | 118 |
| Patel 4 | TEKRIWAL 6 through 8 | 153 |
| Patel 5 | TEKRIWAL 105 through 106 | 159 |
| Patel 6 | OPTUM 301 through 302 | 175 |
| Patel 7 | TEKRIWAL 312 through 321 | 182 |
| Patel 8 | OPTUM 79 through 102 | 182 |
| Patel 9 | PATEL 7 through 8 | 223 |
| Patel 10 | OPTUM 103 through 111 | 238 |
| Patel 11 | TEKRIWAL-67 through 69 | 257 |
| Patel 12 | CH014 | 286 |
| Patel 13 | CH068 through 69 | 287 |
| Patel 14 | CH062 | 289 |
| Patel 15 | OPTUM 305 through 323 | 301 |


REQUESTS FOR DOCUMENT PRODUCTION


| DESCRIPTION | PAGE |
|---|---|
| Text | 287 |




AARTI PATEL, M.D., 13 Canal View Dive, Lawrence Township, New Jersey 08648, sworn.
DIRECT EXAMINATION BY MR. VENTO:
Q Good morning, Dr. Patel.
A Good morning.
Q I introduced myself to you a few seconds ago, but I'm Joe Vento, I'm an attorney at Seyfarth Shaw, and I'm one of the attorneys representing the Defendants in this case that you filed against Optum and Dr. Tekriwal.
We're here today for your deposition.
Do you understand that?
A Yes.
Q Have you ever been deposed before?
A Once.
Q Okay.
How long ago was that?
A I think almost a year and a half ago.
Q Okay.
Was that in connection with a medical malpractice case?
A Yes.
Q Okay, and we'll talk more about that a little bit later.
Any -- other than that case, any other



depositions?
A No.
Q Okay.
So I'm going to give you just some general instructions, guidelines for today.
Generally, I'm going to be asking you some questions, and it's your job to provide truthful answers.
Do you understand that?
A Yes.
Q Do you understand that you're under oath right now?
A Yes.
Q You understand what that means?
A Yes.
Q You understand that your answers today may be used throughout this case up to and including the trial of this case?
A Yes, I do.
Q And you're doing a great job so far. If you could just keep your answers verbal, so "yes" and "no" as opposed to nods of the head or shaking of the head. It will make it easier for Ruth to take down your answers.
Is that okay?

Page 242

finish a stress test within 15 minutes, so I don't know.

Q Okay.

And it looks like just from reading this statement, if you need to read through it, feel free, the third patient who was scheduled at 9:30 complained around 10:17 a.m. asking "How much longer."

Do you see that?

A I do.

Q At that point were you still with the second patient, the 9:15 patient?

A Likely I was, yes.

Q Okay.

A I don't recall exact timing, though.

Q After that test, the second test of the day, Stephanie here says that she saw you get into your vehicle and leave the parking lot.

Is that true?

A No.

Q Okay.

So you think Stephanie is making that up or lying?

A Stephanie is mistaken. I don't know what is going on, but I did not do that.

Page 243

Q What kind of vehicle were you driving at this time?

A We had a Lexus SUV.

Q Okay.

What color?

A It was, like, red with a black stripe on it.

Q And the parking lot of the building -- this is at the Stafford medical building, I'll call it?

A The stress test? Yes.

Q Yeah, where these stress tests were taking place.

What is the parking lot situation there?

A So, you know, the front of the building, there is parking, like, facing the front of the building, and then there is parking where you have another lane, so the back of the cars would be facing the building, so you have those two lanes, then you had cars on the sides and then extended into the back as well, so it was kind of like a horseshoe.

Q So from where Stephanie is at reception, does she have, like, a line of vision from there into the parking lot?

A She can see the parking lot. She can see some of the cars, you know, usually right in the front. She can't see cars on the sides or in the back or anything.

Page 244

Q Do you recall where in the parking lot you parked that day?

A No.

Q Okay.

All right, let's look at the next statement from someone named Olivia. I can't make out that last name.

Do you know who this person is, Olivia?

A Olivia is another secretary who works in the cardiopulmonary stress lab, I think.

Q Do you know what her last name is?

A No.

Q So she says the same thing about this third patient complaining that she had been waiting, but she also says that she saw you leave the parking lot as well.

A Yeah.

That didn't happen.

Q Olivia is also mistaken?

A That is correct.

Q Did you go into the parking lot?

A Yes.

Page 245

Q Did you go into your car?

A Yes.

Q Okay.

Why?

A Well, my initial reason to go outside, I had told Meliss, "Do we have time for me to go grab something from Wawa?"

I usually get grapes and cheese.

And so she said, "Yeah."

So I went out there and I was walking towards Wawa when I got a phone call from a doctor I had been waiting to get a phone call about a patient, and so I ended up realizing I'm not going to be able to go into Wawa because I really wanted this phone conversation, and it was noisy in there, and I needed to listen to him. So I went to my car instead while I was on the phone with him, because I usually keep snacks in my car, and I looked in there, and I had a brown paper bag where I kept, like, protein bars and things like that, so I just grabbed that, but I still was on the phone with him.

Q Who was the doctor you were on the phone with?

A Dr. Chase Contino, C-O-N-T-I-N-O.

Q You were discussing a patient of

Page 246

Chase's?
A Well, it became his patient that day, but it was a patient I had been taking care of all week, and I actually had seen that morning, and her heart rate was very difficult to control.
Q Did you ever search for a record of that phone call?
A Yes.
Q Do you have it?
A Yes.
Q Okay.
Is that something you gave to your counsel?
A Yes.
Q Okay.
I might have missed it. I'll double-back and check in the file.
MR. VENTO: But if we don't have it, Jim, I'll let you know.
Q So you went into your car, you didn't put the car in drive or reverse at all?
A No.
Q The car didn't move, in other words?
A No.
Q Where is that Wawa in relation to the

Page 247

office?
A Just right across the way.
So if the office is here and you walk, you know, kind of -- there is a diner and then there is a road and right away there is a Wawa, so you can see it as soon as you step out and turn to the right.
Q You said that you went into your car to take this phone call, right?
A I did not go into my car to take the phone call.
Q So you took the phone call, but then you went into your car?
A I took the phone call as I was about to go to Wawa. I took the phone call, I turned around, I came back.
As I was on the phone with him, I went to my car to see if there was anything I could eat in there, and that is when I found that brown paper bag, and I took it.
Q What kind of brown paper bag are we talking about?
A Like a lunch bag.
Q Is that because you had purchased these protein bars earlier?
A No.

Page 248

Q Why was that in your car?
A I made it a habit of keeping snacks in the car just because you never know if you need something last minute.
Q Okay.
So there just was a brown paper bag with protein bars and other snacks in your car?
A That is right.
Q Where in the car was it?
A Well, I had to find it because I couldn't remember where it was. My car was very messy, but it was in the front passenger side seat.
Q Okay.
And what kind of protein bar did you find, if at all?
A Well, it was like -- there were two old Quest bars, and I really didn't like them, but I found those.
Q Got it.
Olivia mentions in her statement a floral clutch bag. Does that sound like something that you owned at the time?
A Yes.
Q Did you bring the brown paper bag inside with you to the office?

Page 249

A Yes.
Q All right, let's go to the next person, Christa Gleason.
Do you know who that is?
A She is a medical assistant for Dr. Tekriwal.
Q She says that you mentioned you were going to a QuickChek.
Was there also a QuickChek in the area?
A I misspoke.
Where I used to live there was a QuickChek and a Wawa right across the street from each other, so we would use those words interchangeably.
It's possible I said QuickChek.
Q In many ways, they are interchangeable.
And she says that you returned into the office at 11:05, I guess, a.m.
Is that accurate?
A That is not accurate.
Q Why?
A Because I remember getting off the phone with Dr. Contino at 10:38 and looking at my text messages, and I was standing right outside of the cardiopulmonary lab, so I walked right in. There is

Page 250

no way I waited until 11:05 to enter.
Q Okay.
The next statement is from Meliss, it's kind of an e-mail statement it looks like. Meliss Mirandi, her name came up. Who was that again?
A Meliss was the medical assistant who did my stress test that day with me, and then she continued to assist me in patient care upstairs.
Q And then you get to the next statement, or e-mail statement I guess I should say, apparently from Megan Scott.
Who is that?
A That is another medical assistant of Dr. Tekriwal's.
Q Okay.
A Who -- who helped me that day with patients for a little bit.
Q Okay.
Now, she said she smelled, a more serious allegation, liquor on your breath around 11 o'clock.
See that?
A Yeah.
Q Did you consume any alcohol that day?
A No.

Page 251

Q Do you drink alcohol?
A Yes.
Q How often?
A Sparingly.
Q What do you typically drink when you do drink?
A Like a cider, like a cocktail.
Q Like a hard cider?
A Yeah, like a hard cider if I'm going to have an alcoholic drink.
Q Okay.
Now, the last picture on this page, if you keep going, is a photo of two, I call them, shooters of Fireball whiskey.
Have you ever had Fireball before?
A I have.
Q Okay.
How many times have you had Fireball before?
A Not often.
Q Okay.
You know, realizing you're under oath, did these bottles, did they belong to you that day?
A No.
Q Did you throw threes bottles out in the

Page 252

garbage in the office?
A No.
Q Okay.
Is there any reason why January 26 is a day that might cause you grief or stress or anything like that as compared to other days of the year?
A It's the day that I was accused of this crap.
Q Okay.
Did you ever share with anybody at the office that January 26 had some kind -- had a certain meaning to you?
A The 26th?
Q Yes.
A No.
Q Okay.
Now, this wasn't the first time that you were accused of drinking alcohol while working for Optum, isn't that right?
A This was not the first time I was accused of smelling like alcohol on my breath.
Q Okay.
The first time was from a nurse at the hospital?
A That is correct.

Page 253

Q Okay.
Who was that?
A I don't know.
Q Had you ever met her before that time?
A No.
Q Can you describe her?
A She was new, she was very new, that is what I heard later on from the nurses, blonde.
I don't know.
Q Did you have any issue with that nurse that would cause her to make an accusation that I am sure you consider is untrue?
A I mean, I had an interaction with her that I think made her unhappy.
Q What was that interaction?
A So, on the day in question I went to go see a patient of hers, and the patient -- she was telling me -- you know, I try to talk to the nurses before I go into a patient room, it's my standard of care, so I talked to the nurse and I asked her, "Is she getting her medications, you know, is she getting them, is she taking them?"
And the nurse said, "No, she can't swallow, you have to change her medications to an IV."

Page 258

Q So in front of you is Patel 11, it's Bates-stamped TEKRIWAL 67 to 69.
I'll represent to you that these are text messages between Dr. Tekriwal and someone named Jane Glonek, which is I think G-L-O-N-E-K, with Dr. Tekriwal's messages being in green.
Take a minute to read this, and I want to ask you about what Jane wrote back to Dr. Tekriwal at the bottom and into the top of the second page.
A Okay, I read it.
Q Okay.
She said, "I saw her," you, Dr. Patel, "taking a drink from a small clear bottle," and that she then walked away, and then you came and approached her about it, told her about it being an energy drink.
Is that what happened?
A I don't remember this incident.
Q Okay.
Do you drink energy drinks?
A No.
Q Okay.
Does your husband make energy drinks?
A Make energy drinks?
Q Yeah.

Page 259

A No.
Q Does he ever make, like, juices or drinks that you would take with you to work?
A No.
Q Okay.
Have you ever had an energy drink?
A No.
Q Okay.
This small clear bottle -- strike that.
You don't recall or do you recall speaking to Jane about this incident?
A I really don't know what she's talking about here.
I think the closest estimation that I can recall is when she -- because she left soon after I joined, she retired, but I think I recall, in Dr. Tekriwal's office on a Friday, and he told me I could go into that office and use it when he wasn't there, it was the first time I was in that office, and he has a little fridge, a mini fridge, underneath his desk which has water in it, and he told me I could grab water there anytime I wanted.
I do remember taking a bottle of water from there, which is just like your bottle right now, and drinking from that, when she walked in. That is

Page 260

the only thing I can think remotely related to this.
Q What kind of water was this?
A It was a Poland spring water, I think so.
Q Were they the sizes like the one I have in front of me, which is a 16.9 fluid ounce size, or smaller ones that he kept in his fridge?
A I believe it was that size.
Q Did they have labels on them, the bottles?
A Yes.
Q Okay.
Do you recall when this incident may have been in relation to the incident you told me about with the nurses at the hospital?
A I don't even know what she's talking about here.
If it's in reference to what I just mentioned, that was very early on, like, before she retired. So I don't know.
It was definitely well before that alcohol allegation from the hospital, if it's that case that we're referring to.
Q Understood.
So back to the January 26 incident, I'll

Page 261

call it for a second, do you recall whether you were ever interviewed by anybody from Optum about that, about the accusations that were made?
A I was informed about the allegation by Dr. Brahmbhatt and Tracy Peterson, that was the only time.
Q Do you recall how soon in relation to January 26 that was?
A Yes.
It was on January 29.
Q Okay.
And it was Tracy Peterson and Dr. Brahmbhatt, that is it?
A That is correct.
Q Who is Tracy?
A Tracy, from what I'm led to believe, is in HR.
Q Got it.
And Dr. Brahmbhatt, you said before, is the chief medical officer?
A That is right.
Q What did they say when you spoke to them?
A So, I spoke to them 8 o'clock in the morning I think on January 29, and they told me about

Page 262

the alcohol allegation. I vehemently denied it. I asked about the alcohol bottles, where were they. I asked about where they were found. I was told there was going to be an investigation, they'll look into it, and they'll keep me posted.
Q And that was it?
A That was it.
Q Sounds like it was a quick phone call.
A It was -- well, I mean, it was probably about 15, 20 minutes.
Q Okay.
Did they ask you whether you left the office that day?
A On the 26th?
Q Yeah.
A They asked me -- yeah, I think they did ask me that.
Q And you told them?
A Yes.
Q And did they ask you if you got in your car and drove away?
A Yes.
Q And what was your response?
A "No."
Q Did you tell them about this phone call

Page 263

that you claim you received from a different doctor?
A I did.
Q Okay.
Did you give them the details of that?
A I did.
Q Did you ever send them -- at this time -- did you ever send them proof of that phone call?
A They never asked me.
Q Did you ever offer it?
A I told them "I'll do whatever you want," but they never got back to me after that regarding the alcohol.
Q Okay.
Did they give you any instruction about what to do next after that phone call ended?
A No.
Q Did they say whether you shouldn't go back to work, you're on paid leave, anything like that?
A No.
Q Did they tell you, you know, not to speak to anybody about these allegations?
A No.
Q Okay.

Page 264

After that phone call did you confront Bernadette Perrini and Bobbi Snider about the allegations that were made against you?
A I mean, I wouldn't say the word "confront," but I went to the hospital and then I went to the office thinking I was going to see patients at 11 o'clock, and I normally go to Bernadette's office when I enter Stafford because I don't have an assigned location, she tells me where to go. So I walked into that office and Bernadette was there with Bobbi, and they were talking, so I put my backpack down, and then I did ask them, like, "Hey, did you guys hear anything about this alcohol business?"
I did ask.
Q And what did they say?
A I believe Bernadette said "Yes."
Q Why did you ask them?
A Well, I was in shock, and I was really curious.
Q Was your intention in asking them to find out who complained about you?
A No, it was just to understand better, you know, what was happened.
Q Did you ask that of Tracy or

Page 265

Dr. Brahmbhatt during your phone call?
A Yes.
Q And what did they tell you?
A They said they had to do more investigation.
Q Understood.
Okay.
Did you ask Bernadette to, you know, confirm for you whether certain pills that you had smelled like alcohol?
A No, but there was -- so there is this thing called paan, which is like an Indian mouth freshener, and I used to carry, like, a container of it, and after I got off the phone with Brahmbhatt and Tracy Peterson, I was still home, you know, so my husband was there, and we were just shocked about this allegation, so then he said, "Well, that stuff might make your breath smell a little off because you do eat it a lot."
I said, "Well, that is a good point."
So I asked, "Does it smell like this? Does this smell like alcohol to you?"
Because, to me, I used that since I was a kid, doesn't smell like anything other than what it is.

Page 306

10/24/23. It's in blue.
See that?
A Yes.
Q It says, "Dr. Tekriwal treats me like a mafia family."
A Yes.
Q What does that mean?
A He would say just between you and me, you know, this is just how it is, Optum, and, you know, we do things our way, don't worry.
He would talk about it like, you know, will make it seem like it's fine, we got this, we don't have to tell Optum everything we're doing.
Q Got it.
That doesn't sound, and tell me if I'm wrong, like that is a negative thing.
A It was very uncomfortable for me.
Q Oh, okay.
Why was that uncomfortable for you?
A Because it was in the context of me telling him what Optum wanted us to do, and he is telling me essentially, "No, don't worry about it," but I'm the one who had to address that with him.
Q Was there anything in particular you can think of that Optum wanted you to do that

Page 307

Dr. Tekriwal said to ignore or do something different?
A All I can think about is pacemaker and office checks.
Q Which we discussed already.
A Which we already discussed, yes.
Q Actually, I skipped one.
Just above that, the 9/27/23 note, it says, "Feels bullied by Dr. Tekriwal," in quotes. "He is trying so hard to make it look like I'm incompetent," end quotes.
Do you know -- there is a second sentence that you can read, but I just want to know, do you know what this is in reference to?
A I mean, I think I repeated this so many times with Dr. Scivone, I don't recall exactly.
I think I was mentioning how I was trying to understand workflow and asking questions from him was hard to get a solid answer and -- but yet at the same time he would be, like, "Well, you didn't read these."
I'd be like, "I don't know what you're expecting of me."
I remember some frustration around it, but I can't give you specifics.

Page 308

Q Go to OPTUM 318 quick.
A Sure.
Okay.
Q There is a note in the middle, "Back from Las Vegas getaway," 5/28/24.
Do you see that?
A Yes.
Q What is that in reference to, do you know?
A Yes.
I don't remember when, but it was while I was still working. I had purchased tickets to see a comedy show in Vegas, and had paid for the trip and everything. That was my husband's birthday present.
Q Got it.
MR. VENTO: I think that's probably all I have. If you wouldn't mind just giving me a few minutes to just look through my notes, and then we'll see if your attorney has any questions; otherwise, I think we'll be wrapping up.
(Brief recess taken.)
MR. VENTO: I have no more questions.
MR. BURDEN: I have no questions. I'm going to order a copy of the transcript.
(Proceedings concluded at 4:45 p.m.)

Page 309

C E R T I F I C A T E

I, RUTHANNE UNGERLEIDER, a Certified Court Reporter and Notary Public of the State of New Jersey, certify that the foregoing is a true and accurate transcript of the stenographic notes of the deposition of said witness who was first duly sworn by me, on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney, nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel in this case, nor am I financially interested in this case.



RUTHANNE UNGERLEIDER, C.C.R., C.R.R.
LICENSE NO. XIO1634, XIO0115